UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARK S. FRANKLIN, D.O.,

       Plaintiff,

v.                                    CASE NO.: 8:07-CV-1400-T-23MAP

HARTFORD LIFE INSURANCE COMPANY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

This is an action to recover long term disability benefits governed by the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.* Plaintiff Mark Franklin, an osteopathic family practice physician, suffers from rheumatoid arthritis, osteoarthritis, and a herniated lumbar disk. On December 15, 2004, Plaintiff stopped working due to pain, stiffness, and a decrease in mental functioning, and five days later underwent hip replacement surgery. Although he attempted to return to work in January 2005, Plaintiff claims he was unable to make it through the day due to pain, and applied for disability benefits with Hartford Life Insurance Company ("Hartford"), the claims administrator of Plaintiff's employee welfare benefit plan. Initially, Hartford awarded long term disability benefits; however, after conducting an independent investigation, Hartford denied further payment of benefits beyond June 30, 2006, concluding Franklin had no documented impairment that would prevent him from returning to work as a primary care physician. After exhausting his administrative remedies, Plaintiff filed suit against Hartford. At this juncture, the parties have filed cross motions for summary judgment which the district judge has referred to me for a report and recommendation. *See* doc. 26. The issues are whether Hartford's decision to terminate Plaintiff's disability benefits was wrong, and if so, whether

Hartford acted arbitrarily and capriciously in terminating Plaintiff's benefits. After reviewing the record, I find it Hartford's decision was both wrong and arbitrary and capricious, and recommend the district judge deny the Defendant's motion and grant the Plaintiff's motion.

### A. Standard of review

#### 1. summary judgment

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.*

#### 2. ERISA framework

Because ERISA does not expressly set forth the appropriate standard of review for actions challenging benefit eligibility determinations under 29 U.S.C. § 1132(a)(1)(B), the district court examines the plan documents to determine the applicable standard of review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989), *Taylor v. Broadspire Servicing, Inc.*, 2008 WL 3864252 (11th Cir. Aug. 21, 2008). In the past, the Eleventh Circuit has directed district courts through a "well-defined series of steps" in reviewing a decision to deny disability benefits in an ERISA case. *Tippett v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1231-32 (11th Cir. 2006). The six steps were:

1) Apply the *de novo* standard to determine whether the claim

administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision;

2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, then end the judicial inquiry and reverse the decision;

3) If the administrator's decision is "de novo wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard);

4) If no reasonable grounds exist, then end the inquiry and affirm the decision;

5) If there is no conflict, then end the inquiry and affirm the decision;

6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Doyle v. Liberty Life Assurance Co. of Boston*, 2008 WL 4272748 (11th Cir. Sept. 18, 2008).

However, in *Metropolitan Life Ins. Co. v. Glenn*, _ U.S. _, 128 S.Ct. 2343 (June 19, 2008), the

Supreme Court implicitly overruled the heightened arbitrary and capricious review (step six above).

*See Doyle,* at *6 ("*Glenn* implicitly overrules and conflicts with our precedent requiring courts to

review under the heightened standard a conflicted administrator's benefits decision.").   In *Doyle*,

the Eleventh Circuit acknowledged that reviewing courts must consider an administrator's conflict

of interest in deciding whether the decision to deny benefits was arbitrary.  The *Doyle* court stated:

We hold that the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious.  And, we hold that, while the reviewing court must take into account an administrator's conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.

*Doyle*, at *7.

Here, the parties agree that the plan documents expressly grant Hartford discretion in making

benefit determinations.  See statement of facts ¶2.  Hartford concedes that it has a conflict of interest

because it is responsible for both deciding and paying claims, and thus, the arbitrary and capricious

standard is applicable.  *See* doc. 21, p. 17.  Hence, pursuant to *Glenn* and *Doyle*, this Court should consider Hartford's conflict when determining whether Hartford's decision was arbitrary and capricious.

Regardless of the applicable standard of review, however, the court first evaluates the claims administrator's interpretation of the plan to determine whether it is "wrong."  *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008).  "Wrong," as the Eleventh Circuit uses the term in ERISA cases, means "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation."  *Id.*  If the claims administrator's interpretation is "wrong," the court then decides whether "the claimant has proposed a 'reasonable' interpretation of the plan."  *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir. 1994).  Even if the claimant's interpretation is reasonable, that does not mean he automatically prevails.  *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 992 (11th Cir. 2001) citing *Firestone, supra,* 489 U.S. at 111 ("We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo*, review is that a court defers to the discretion afforded the claims administrator under the terms of the plan."); *Brown v. Blue Cross & Blue Shield*, 898 F.2d 1553 (11th Cir. 1990)*;  Restatement (Second) of Torts* § 187 (1959) ("[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion").  Guided by the principle of trust law that a trustee's interpretation should not be disturbed if it is reasonable, a claims administrator's wrong interpretation is arbitrary and capricious only if it is unreasonable.  *HCA, supra,* at 992, citing *Firestone, supra,* 489 U.S. at 110-11.  The claimant bears the burden of proving that he is entitled to benefits.  *Horton v. Reliance Standard Life Ins. Co.*, 141

F.3d 1038, 1040 (11th Cir. 1998).

    *B.  Administrative background*

       Plaintiff, a family practice physician, was employed by Medical Associates of Pinellas, LLC ("MAP") and participated in group long term disability insurance pursuant to an employee welfare benefit plan.  The insurance policy was issued to MAP by CNA Group Life Assurance Company, now known as Hartford Life and Accident Insurance Company ("Hartford Life").  The policy provides long term disability benefits to Plaintiff as a MAP physician, and defines disability as "*Injury*" or *"Sickness*" that "causes physical or mental impairments to such a degree of severity that *You* are 1) continuously unable to perform the *Material* and *Substantial Duties* of *Your Specialty*; and 2) not *Gainfully Employed*" (H1043).  The policy defines "*Material and Substantial Duties*" as the "necessary functions of *Your Regular Occupation* or *Specialty* which cannot be reasonably omitted or altered." (H1056).  The policy provides that "*Specialty* with respect to physicians or dentists, means the general or sub-specialty in which *You* are practicing for which there is a specialty or sub-specialty recognized by the American Board of Medical Specialties.  If the American Board of Medical Specialties does not recognize the sub-specialty in which You are practicing, You will be considered practicing in the general specialty category.  *Specialty* shall include any general or sub-specialty in which you practiced in the 5 years immediately preceding *Your Date of Disability*."(H1057).

       MAP completed a Physical Demand Analysis describing that family practitioners such as Franklin are the "first point of contact for those seeking healthcare" with responsibility for assessing and treating a wide range of ages and conditions.  The Physical Demand Analysis indicated that family practitioners' work is "primarily cognitive" and its physical demands require sitting for up to thirty minutes at a time, standing for up to thirty minutes at a time, and walking for up to thirty

minutes at a time.  In a typical work day, Franklin was required to sit for a total of three hours, stand for a total of four hours, and walk for a total of one hour (H407, H411-412).

Plaintiff alleges he stopped working on December 15, 2004, due to pain, stiffness, and a decrease in mental functioning.  Plaintiff's treating rheumatologist, Dr. Robert DiGiovanni diagnosed rheumatoid arthritis,[1] osteoarthritis,[2] and a herniated lumbar disk.  On December 20, 2005, Plaintiff underwent left hip replacement surgery by Dr. John Kilgore (H681).  Following surgery, Plaintiff returned to work for a short time, but ceased working due to pain as of January 11, 2005.  The administrative record contains treatment records of Dr. DiGiovanni from September 8, 2004, through March 17, 2006 (H526-H580).  The records consist of an initial consultation, several MRI reports, laboratory results, and numerous progress notes.  The progress notes, the bulk of Dr. DiGiovanni's records, are merely forms with the Plaintiff's weight, height, blood pressure, reason for visit filled in, and a list of symptoms, impression, and medications so that the doctor can circle the relevant ones.  For instance, the progress note from January 26, 2005, has RA (presumably rheumatoid arthritis) circled as Plaintiff's "problem," and "Pos" is circled next to "synovitis"[3] and

---

[1]  Rheumatoid arthritis is a chronic inflammatory disease of the joints that affects an estimated 1.3 million Americans.  The disease occurs when the body's immune system – which normally protects us from infection – mistakenly attacks the synovium, the thin membrane that lines the joints.  The result can be joint damage, ongoing pain, inflammation, loss of function and disability.  *See www.arthritis.org/faq-about-ra-2.php (created January 4, 2008).*

[2]  Osteoarthritis, sometimes called degenerative joint disease or degenerative arthritis, is the most common chronic condition of the joins, affecting approximately 33 million Americans.  In osteoarthritis, what gradually breaks down is the cartilage covering the ends of bones where they meet to form a joint and allow movement.  As the cartilage wears away, the bones become exposed and rub against each other.  *See www.arthritis.org/faqs-about-oa.php. (created January 7, 2008).*

[3]  Synovitis is inflammation of the synovium, the membrane that lines a joint.  Synovitis is a common feature of inflammatory forms of arthritis, such as rheumatoid arthritis.

(continued...)

has the words "not much improvement" and distress secondary to polyarthritis handwritten onto appropriate sections of the form (H542).  On the progress note from March 1, 2005, RA is again circled as the "problem," "NAD" (presumably no acute distress), "still active RA" (rheumatoid arthritis), and "Neg" is circled next to "synovitis" (H540).   Dr. DiGiovanni's progress notes dated April 1, 2005, indicates RA, NAD (no acute distress), arthralgia, and "Pos" for synovitis (H538), and the progress note from May 11, 2005, indicates RA, fatigue, arthralgia, NAD (no acute distress), and "Pos" examination for synovitis (H536).  Dr. Giovanni's progress note dated July 1, 2005, indicates Plaintiff was "part-time teaching," RA, NAD (no acute distress), and examination was "Neg" for synovitis (H534), and the progress note dated May 23, 2005, indicates RA, "fatigue & abdominal pain p MTX," (methotrexate) (H532).   The progress note from October 12, 2005, indicates RA, "nausea, fatigue, abdominal cramps p MTX," NAD, and "Pos" for synovitis (H530). On that same date, Dr. DiGiovanni completed a Functional Assessment Tool form for Hartford where he indicated Plaintiff was currently not capable of performing full-time work.  The Functional Assessment Tool  noted Plaintiff's "+ MRI erosions," "L total hip replacement," and "ongoing care for rheumatoid arthritis" and indicated Plaintiff was taking methotrexate,[4] Vicodin,[5] atenolol,[6] and

---

[3](...continued)
*www.arthritis.org/at-glossary-s.php.*

[4]  Methotrexate is a disease-modifying antirheumatic drug (DMARD) that may actually modify the course of inflammatory conditions, slowing or perhaps even stopping their progression.  www.arthritis.org/types-of-drugs.php?dt_id=5 .

[5]  Vicoden is an analgesic medication used for pain relief.  www.arthritis.org/types-of-drugs.php.

[6]  Atenolol is a beta blocker often used to treat high blood pressure. www.arthritis.org/types-of-drugs.php.

Ambien.[7] (H629).  Thereafter, Dr. DiGiovanni's progress note from December 7, 2005, shows RA, NAD, and "Neg" for synovitis (H528).  The most recent progress note from Dr. DiGiovanni dated March 17, 2006, indicates that Humira helped arthritis but severe injection site reaction and has had to discontinue, NAD, and "Neg" for synovitis (H526).

The administrative record reveals that Plaintiff sought treatment from a pain management specialist, Dr. Susanti Chowdhury, on January 11, 2005, with complaints of hand, wrist, neck, hip, feet, and knee pain.  Dr. Chowdhury diagnosed hip arthropathy status post left total hip replacement, rheumatoid arthritis, osteoarthritis, lumbar radiculopathy, hypertension, and diverticular disease. Noting Plaintiff's intolerance for anti-inflammatory medications, Dr. Chowdhury recommended Plaintiff restart Vicoden, a narcotic, and take time off from work.  She indicated that "[i]f the patient is unable to find any other antiarthritic medications which can help him in his pain, he may need to consider retiring from his practice."  (H692-694).

In addition to the medical records, the administrative record contains Hartford's notes from an interview with Plaintiff on October 6, 2005 (H589).  At the interview, Plaintiff advised Hartford's employee Manuel Cocurull that he no longer uses a cane and can ambulate independently, but is still in a great deal of pain with stiffness and fatigue.  The notes indicate Plaintiff was taking Vicodin, methotrexate, and Ambien, and described pain when sitting, standing, stooping, walking, and changing positions.  Plaintiff relayed that he cooks, cleans, and bathes himself, but needs assistance with dressing because he cannot reach his left foot.  The notes further indicate Plaintiff reported he volunteers with his church for about an hour a day, and occasionally feeds the homeless (H589).

---

[7]  Ambien is a prescription benzodiazepine medication that induces drowsiness by working on a particular receptor in the brain, called GABA, believed to be influential in sleep. www.arthritis.org/insomnia-ra4.php.

Because Plaintiff described his pain as "all day, everyday," but admitted to engaging in activities of daily living and volunteering with his church, and because his updated medical records were "not very revealing," Cocurull referred Plaintiff to Hartford's Special Investigation Unit (H588) for further investigation.

Hartford's video surveillance on December 17, 2005, shows Plaintiff driving to a Verizon cellular phone store, a health food store, and a greeting card store. The video reveals Plaintiff carrying shopping bags and walking short distances with a normal gait. Video from the next day, December 18, 2005, shows that Plaintiff did not leave his home during ten hours of surveillance. Surveillance from January 21, 2006, shows that Plaintiff remained inside his home from 5:27 a.m. until 4:32 p.m. when he left his home, departed in his SUV with his wife and drove from Largo to downtown Tampa. At 5:20 p.m., Plaintiff arrived at a parking lot near the St. Pete Times Forum and walked from his SUV to the arena to attend a gospel and country music concert along with several thousand attendees. Plaintiff stayed in the arena until 9:15 p.m., when he walked back to his SUV and drove back to his Largo home. He arrived at his home at approximately 10:00 p.m. The following day, January 22, 2006, Plaintiff left his home at 11:00 a.m., drove to a skilled nursing facility, spent about 70 minutes there, and then returned to his home. At 12:49 p.m., Plaintiff drove his wife to Largo Community Park and Recreation Center where they had lunch outdoors then walked along a trail out of view. Plaintiff and his wife returned to their SUV at 1:32 p.m., and returned to their home. Plaintiff left his home shortly before 2:00 p.m., drove to Indian Rocks Christian School ("IRCS"), exited his SUV, and walked inside the school building carrying a backpack. Plaintif returned to his SUV at 3:43 p.m., with his backpack over his right shoulder, holding books in his right hand, and a large cup in his left hand. As he approached his SUV, Plaintiff switched the books to his left hand, opened the rear driver's side door with his right hand,

placed the books inside the SUV, switched the cup to his right hand while removing the backpack from his shoulder and placing it in the SUV, and closed the door with his left hand.  He opened the driver's door with his left hand, and drove home.

Surveillance on February 2, 2006, showed Plaintiff drove to IRCS at 10:24 a.m., spent about an hour and fifteen minutes in the school building, again carrying his book bag over his shoulder while walking to and from his SUV, driving one hour to a doctor's office , and driving with his wife to Largo Central Park where they walked along a path.  Surveillance was again conducted on February 3, 2006, however Plaintiff was not observed at all during five hours of monitoring. Monitoring resumed on February 10, 2006, and Plaintiff was observed leaving his home shortly before 10:00 a.m., driving to IRCS, walking with a slight limp as he entered the school, returning to his home at 11:25 a.m., leaving his home again and driving ten minutes to a McDonald's restaurant, entering the restaurant for five minutes, driving to Nature Preserve Park, exiting his SUV and carrying binoculars, walking along a nature trail and out of view of surveillance.  Plaintiff was again observed about an hour and a half later leaving the parking lot in his SUV.  Plaintiff returned home at 2:46 p.m., and was not observed leaving his home for the remainder of the day.

On April 13, 2006, Hartford investigator Edward Golden interviewed Plaintiff at his home for more than two hours (H227-257).  Golden's report reveals that Plaintiff displayed indicators of pain by wincing, changing positions, rotating his right shoulder, verbalizing his complaints of pain, taking pain medication, and getting up from a seated to a standing position six to eight times during the interview.  Plaintiff explained that it takes him about three hours each morning to loosen up after awakening, aided by a hot shower and medication.  Plaintiff described that on a good day he can walk or stand for up to forty-five minutes, and drive up to sixty minutes, before needing to rest, but that there are days when he cannot walk at all due to pain.  Plaintiff stated he is unable to squat or

kneel, has difficulty sleeping, naps during the day, and has difficulty concentrating.  Plaintiff readily admitted that on a typical day he volunteers to teach a class at a Christian high school or helps to feed the homeless for about an hour, takes a nap, goes for a walk at the beach or a park for about 30-45 minutes, runs an errand or goes to a store, has dinner around 6:00 p.m., and watches T.V. until bedtime.  He indicated he cannot tie his shoes and needs assistance putting on his left sock.  Plaintiff opined he is unable to work due to rheumatoid arthritis, osteoarthritis, and a herniated lumbar disc.  He said these conditions cause pain in his hands, fingers, wrists, shoulders, feet, hips, and neck.  According to Plaintiff, he is unable to diagnose, treat, see patients, round at the hospital, wake up in the middle of the night to give orders, perform physical manipulations, and surgical procedures.  Plaintiff told Golden that he had taken Advil, Hydrocodone, and Atenol on the interview day, but felt he was able to provide a "clear and coherent" interview and statement despite these medications.

On May 30, 2006, Hartford corresponded with Dr. DiGiovanni, enclosing the surveillance video and reports and requesting he review them.  Hartford advised Dr. DiGiovanni that in its assessment Plaintiff appeared capable of returning to work as a family practice physician, and asked Dr. DiGiovanni if he agreed with its assessment.  The letter advised that if in fact Dr. DiGiovanni disagreed with the assessment he submit specific restrictions and limitations and supporting medical rationale (H-402-403).  Dr. DiGiovanni responded via letter dated June 1, 2006, indicating he did not have time to review the surveillance, and opining that the Plaintiff's activities on the surveillance video did not compare to the "extensive demands of practicing primary care medicine 8-12 hours a day 5-7 days a week depending on a doctor's schedule."  (H399).  The letter states:

> Dr. Franklin is under care for rheumatoid arthritis.  He has MRI studies of the hands and wrists performed on October 20, 2004, showing subacute erosions in the 3rd metacarpal head of the right hand.  He had no erosions in the left hand or wrist but he had lunotriquetral coalescence, which may affect range of motion and function in that hand as well.  Clearly, a physician is going to require fine dexterity for function

11

as a physician.

My records indicate further that he has been taking immunosuppressive drugs including Humira and and Enbrol.  These will drop a patient's immune response, and it is <u>not</u> advisable for him to be around sick patients, acquiring pneumonia or other opportunistic infections.  This could be a life-threatening situation for him.

My records further indicate that he has been on other immunosuppressive agents, including methotrexate, with similar types of risk factors.  Most recently, on my office visit of May 12, 2006 I had to start him on steroids (prednisone).  Also, he takes hydrocodone, an opiod derivative on a regular basis for pain.  This may affect cognitive function.  I would put it to you whether or not you would select a physician yourself who is on opiod derivatives for pain on a regular basis.

In addition, Dr. Franklin has undergone total hip replacement.  Please check with orthopedic surgery regarding the status of this.

In summary, although he can walk and carry groceries, or give a lecture to the Christian school, I certainly would not put this into the category of practicing medicine on these types of medications and with these types of findings.  I do not think he is going to be capable of employment in his primary area of employment as a primary care physician.

(H400-401).

The administrative record shows that Hartford arranged for an independent group of physicians specializing in disability evaluations to review Plaintiff's claim.  Dr. Norman Bress, M.D., a Board Certified rheumatologist reviewed Plaintiff's medical records, the surveillance materials, and Dr. DiGiovanni's letter (H388-397).  Upon review, Dr. Bress issued a written report to Hartford opining as follows:

In summary, the insured has well documented RA, osteoarthritis of the left hip with total hip replacement and a herniated disk on MRI.  Cognitive impairment is also claimed.  Theoretically, one or all of these entities could contribute to an impairment. However, Dr. DiGiovanni does not mention the presence of decreases in range of motion, deformities, or comment on muscle weakness/ atrophy around the joints, including grip strength.  There is no evidence that a cognitive deficit has been objectified or that Dr. DiGiovanni noted such a problem on exam.  During the latest visit in the record, dated 3/17/2006, Dr. DiGiovanni reports no synovitis.

In view of the documentation in the record, my opinion with regard to functionality

is as follows:

1.   RA: As of 03/17/2006, Dr. DiGiovanni reported no synovitis, no decreases in range of motion, no deformities, and no muscle weakness/ atrophy surrounding any joints.   It is therefore my opinion that the claimed impairment (that the insured is unable to work as a primary care physician) is not supported on the basis of activity of his RA.

2.   Total Hip Replacement: In view of the fact that the insured is noted to walk without a limp and without use of an assistive device on video surveillance, it is my opinion that the claimed impairment (that the insured is unable to work as a primary care physician) is not supported on the basis of the total hip replacement.

3.   Herniated Lumbar Disc: Exams in this regard have been negative and [t]here is no evidence of a radiculopathy.  Neurologic exams have been negative. My opinion with regard to impairment on this basis is that the insured should avoid lifting more than 10 pounds from below.

4.   Medications: Although theoretically side effect of medications could be responsible for an impairment, there is no evidence in the record that this is the case in the insured. Dr. DiGiovanni mentioned that the insured "should not be around sick people" because of the possibility of contracting an infection.  Although the tumor necrosis factor inhibitors may be associated with infections, there is no recommendation from the manufacturers of these medications (Enbrel, Humira, and Remicade) that patients on these medications should avoid contact with the general public, even in doctors' offices.  It has been my experience, in agreement with the experience of other rheumatologists with whom I spoke, that patients on these medications do not need to be restricted from coming into contact with the general population.

H 393-394.  Dr. Bress indicated in his report to Hartford that per its request he had attempted to speak with Dr. DiGiovanni on two occasions, but was advised by his office staff that Dr. DiGiovanni would prefer a letter rather than a telephone conversation.  As a result, Dr. Bress wrote a letter to Dr. DiGiovanni dated June 15, 2006, asking for further information about Plaintiff's medical condition and treatment (H396-397).

On June 27, 2006, Hartford notified Plaintiff of its decision to discontinue benefits effective June 30, 2006.  The letter explained that based on the medical records, medical history, claim forms

13

and questionnaires, assessments, activities checks, and face-to face interview, the current information does not illustrate a condition which continues to prevent him from performing the material and substantial duties of his regular occupation/ specialty.  The letter acknowledged that Hartford had requested a physician-to physician telephone contact between its independent physician, Dr. Bress, and Plaintiff's treating physician, Dr. DiGiovanni, but that Dr. DiGiovanni had requested  a letter be mailed to him in lieu of a telephone conference, and to date (twelve days after Hartford sent the letter) Dr. DiGiovanni had not responded (H383-385).

Plaintiff appealed Hartford's benefits termination via letter dated July 10, 2006.  The appeal letter, signed by Plaintiff, indicated he is "unable to work for multiple reasons" including pain in his neck, hands, wrists, shoulders, knees, thoracic spine, lumbar spine, hips, ankles, and feet.  He reported stiffness in his spine, hands, hips and knees, that the class he taught was only one hour long and the class time was changed from 7:30 a.m. to 10:30 a.m. to accommodate his morning stiffness and soreness; that a wrong answer in class would not affect anyone's health or well-being and could be corrected the following class; that he had taken extra pain medication before attending the three-hour plus graduation concert (on January 21, 2006, surveillance), had been unable to stay for the reception and photos, and required a sleeping pill and pain pill after the concert that osteopathic manipulation is an important part of his practice and he could not perform them now; that his physical pain, stiffness, and fatigue would cause him to be unreliable in his ability to commit to even part-time work as a family practice physician; and that he would be breaking the law to practice medicine under the influence of the medications he now takes.  He also requested that Hartford "not harass my physicians" (H191-192).  On July 14, 2006, Plaintiff sent an addendum to the appeal letter, discussing the "chronic fatigue" he suffers as a result of rheumatoid arthritis, necessitating a nap lasting at least two hours each day (H188).  He wrote "Please review your stance.  I did not

electively have hip replacement.  The inflammatory changes on MRI of the left hip prior to surgery, are more consistent with RA than OA.  My diagnosis is not in question and the prognosis, having been on all the medication I have taken, is for deterioration not improvement. I feel your termination is not only in error but may be malicious in nature"  (H188).

On August 30, 2006, an Appeal Specialist from Hartford notified Plaintiff that Hartford had completed its appeal review and based on the evidence currently in its file found that it does not support a specific functional impairment that would preclude him from performing the material and substantial duties of his occupation as of June 26, 2006 and beyond.  Once again, the letter noted Dr. DiGiovanni's lack of response to Dr. Bress's letter that he answer specific questions regarding Franklin's claimed impairments dated June 15, 2006 (H59-62).

C.      Discussion

1. Hartford's decision "wrong"

Plaintiff argues that the administrative record establishes his entitlement to continued disability benefits.  In considering Plaintiff's contention, this court must decide whether Hartford's denial of benefits was "wrong." *Glazer, supra,* at 1247.  After reviewing the administrative record, I find that Hartford's discretionary decision to discontinue Plaintiff's disability benefits was *de novo* wrong, as the record establishes that Plaintiff was physically and mentally impaired to such a degree of severity that he could not perform the material and substantial duties of a family practice physician.  The evidence Hartford relied on in terminating benefits is not persuasive.  Although Hartford points to a lack of synovitis and absence of range of motion problems, examination of the administrative record as a whole reveals that Plaintiff experienced synovitis and range of motion

limitations consistent with rheumatoid arthritis.[8]

The beginning of any *de novo* analysis of a disability claim is a review of the objective medical findings.  In this case, MRI studies of Plaintiff's hands and wrists performed on October 20, 2004, reveals subacute erosions in the third metacarpal head of the right hand, and lunotriquetral coalescence in the left hand possibly affecting range of motion and functioning (H400), and "laboratory studies [showing] some nonspecific findings of inflammation including ANA positivity, a polyclonal gammopathy, ... [and a] previously positive rheumatoid factor, elevated C-reactive protein of 6.2. …" (H578).[9]  Examination confirmed inflammation of the hands and wrists, consistent with inflammatory arthritis (H578).  Moreover, numerous examinations during the relevant time frame revealed synovitis:  on January 26, 2005 (H542), on April 1, 2005 (H538), on May 11, 2005 (H536), and on October 12, 2005 (H530).

Plaintiff's subjective input illuminates the results of the objective tests.  Plaintiff's appeal letter to Hartford, summarized above, explained that he has pain in his neck, hands, wrists, shoulders, knees, thoracic spine, lumbar spine, hips, ankles, and feet, and stiffness in his spine, hands, hips, and knees that "present in varying degrees every day" (H191, appeal letter).  Plaintiff's letter further explained that:  "When I have a commitment that entails extended sitting, standing, bending, or being on my feet it is necessary that I take additional pain medication to perform.  This

---

[8] "Although rheumatoid arthritis is a chronic disease, its symptoms can come and go. Periods of mild disease activity can be punctuated by flares, or periods of more intense disease activity and symptoms.  In some cases, with appropriate treatment, the disease may become inactive and symptoms may go away completely."  *www.arthritis.org/faqs-about-ra-2.php*.

[9] More recently Plaintiff's rheumatoid arthritis serological test was negative, however approximately twenty-five percent of patients with rheumatoid arthritis do not have a positive arthritis serological test (H580).  *See* Harrison's Principles of Internal Medicine, p. 1945 (6th ed. 1970).

medication is taken prior to the activity because I would not be able to do it otherwise (H191)." Plaintiff's explanation about teaching the high school anatomy class is particularly telling: "The course time was changed from 7:30 am to approximately 10:30 am because I am to [sic] stiff and sore that early in the morning.  I volunteered because I was unsure if I could even meet the one hour per day need.  I needed little unscripted knowledge for the class, because a wrong answer would not affect anyones [sic] health or well being.  Any mistake could be corrected the next day without consequence" (H191).

The complaints and descriptions set forth in Plaintiff's appeal letter are consistent with both the remainder of Hartford's administrative record and with the progressive nature of rheumatoid arthritis.  The administrative records documents that following his left hip replacement surgery, Plaintiff attempted to return to work.  Because he experienced pain, swelling and difficulty sleeping, he reported to Dr. Chowdhury, a pain management specialist, for consultation.  Dr. Chowdhury's records indicate Plaintiff described his pain as "7 to 8/10 and ranges from a 2 to a 9/10" (H692). Upon examination, Dr. Chowdhury noted tenderness to multiple joints including elbows and fingers, and an early nodular appearance in his fingers (H693), and Dr. Chowdhury recommended that if Plaintiff continues on narcotic pain medications (Vicoden at the time) he should not work.  Dr. Chowdhury opined that Plaintiff may need to consider retiring from his medical practice if he is unable to find any other anti-arthritic medications to help him with his pain (H694).  Plaintiff's complaints are also verified by Hartford's own interviewer who observed:

> … the claimant did display some pain indicators by wincing when changing positions and rotating his right shoulder.  Additionally, the claimant verbally complained of pain and discomfort and took Hydrocodone during the interview.  The Investigator observed that the claimant got up and down, from seated to a standing position, approximately 6-8 times during the entire interview process" (2 1/4 hours).

(H201).

17

Similarly, in a June 1, 2006 letter to Hartford (sent after receiving a copy of Hartford's surveillance video of Plaintiff), Dr. DiGiovanni described Plaintiff as a typical patient with rheumatoid arthritis.  Dr. DiGiovanni stated:

> Clearly, a patient with rheumatoid arthritis will have certain activity levels that he will be able to do.  All of my patients with rheumatoid arthritis have some functional capacity or limitation.  I certainly cannot compare these activities to the excessive demands of practicing primary care medicine 8-12 hours a day 5-7 days a week depending on a doctor's schedule.

(H399).

Plaintiff's appeal letter to Hartford illuminates his doctors' concerns:

> … It is also essential that I be dependable, reliable, and mentally capable to make complicated health care decisions.  It would be inappropriate for me to diagnose and treat patients under the influence of the medications I must take. … Also the physical fatigue, pain and stiffness caused me to be unreliable in the ability to make even a ongoing part time commitment.  It is also impossible for me to physically treat my patients with Osteopathic Manipulation in a manner that is consistent with my treating and practice.  Even complete examination of my elderly or disabled patients would be impossible. … if you are having a practicing physician review this record, I hope he is not under the influence of these medications.  I hope he is not sick for two days after taking the methotrexate and enbrel.  I hope he is not making life or death decision [sic] while taking these medications, because he would be morally and legally wrong.…

 (H191-192).

Finally, there is little evidence in the administrative record to contradict the Plaintiff's representations about disability and the opinions of his doctors.  In terminating benefits, Hartford relied primarily on its rheumatology consultant, Dr. Norman Bress, who opined after reviewing Hartford's file that Plaintiff is capable of returning to his own occupation (H69).  The letter advising Plaintiff about the termination of disability benefits advised that "Although you have a history of rheumatoid arthritis and total hip replacement, there is no evidence of significant deformities or muscle weakness/ atrophy around the joints.  Also there is no evidence of cognitive deficit that has been objectified.  Although you had a hip replacement on 12/20/04, you are able to remain on your

feet for relatively prolonged periods and ambulate in an essentially normal manner (H69)." As another district court in this circuit recently noted, however, there is no more a presumption in favor of a consultant's opinion than there is in favor of the treating physician's opinion. "Just as a treating physician may have interests that influence his opinion in favor of the claimant, a consultant may have interests that influence his opinion in favor of the insurer. Moreover, the value of the consultant's opinion is reduced by the fact that the consultant has not had the opportunity to see or examine the claimant." *See Babb v. Metropolitan Life Ins. Co.,* 2008 WL 4426059, *10 (M.D.Ga. Sept. 25, 2008).

In sum, the strong weight of the evidence in Hartford's administrative record supports Plaintiff's claim that he is unable to perform the material duties of his job as a family care physician. His claims of severe debilitating pain and cognitive dysfunction are consistent with the medical records, side effects of his medications, and typical progression of rheumatoid arthritis. Hence, standing in the shoes of the administrator, I recommend a finding that Hartford's decision to terminate benefits was "wrong."

### 2. *Hartford's decision arbitrary and capricious*

Because I find Hartford's decision to terminate disability benefits was "wrong," I must decide whether its' decision was arbitrary and capricious. The appropriate inquiry is whether there was a reasonable basis for Hartford's decision, based upon the facts as known to the administrator at the time the decision was made. As described above, it is irrelevant that the Court or anyone else might reach a different conclusion; the Court should not second guess the plan administrator's decision. *Lee, supra,* 10 F.3d at 1550; *HCA Health Services of Georgia, Inc.*, 240 F.3d at 992.

As Plaintiff asserts, Hartford's expert, Dr. Bress, erred in stating that "there has been no reported synovitis, decrease in range of motion, deformities, and no muscle weakness or atrophy

surrounding any joints during physical examinations." *See* H186.   Hartford's statement is inflammatory, as the treatment records indicate synovitis and decreased range of motion on roughly half of Dr. DiGiovanni's notes and on his the Functional Assessment Tool (H629).   It seems that Hartford emphasized certain medical reports that favor a termination of benefits while de-emphasizing other reports that suggest a contrary conclusion.   For instance, Hartford noted that on his last visit with Dr. DiGiovanni, on December 7, 2005, Plaintiff had no synovitis, but failed to mention that multiple other visits found synovitis.  See H530, H536, H538, H542.  *See Glenn*, 128 S.Ct. at 2352 (court observed that MetLife had emphasized a certain medical report that favored a denial of benefits and had deemphasized certain other reportst hat suggested a contrary conclusion); *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1556-57 (11th Cir. 1990) (finding administrator's decision to deny benefits that was supported by reasonable grounds in record but which also rejected credible evidence of disability had practical effect of advancing the administrator's self interest).

Hartford's reliance on its surveillance of Plaintiff in support of its decision to terminate benefits is also misplaced.  The surveillance footage recorded by Hartford's investigative unit shows a "mere snapshot" of Plaintiff's activities throughout several days of his life.  The surveillance spanned seven days, but produced only about twenty hours of activity.  The footage shows Plaintiff's limited ability to walk, drive, and get in and out of his sports utility vehicle.  The surveillance is consistent with Plaintiff's own admissions about his capabilities, and offers no proof that he is capable of work as a family practice physician.  In fact, consistent with Plaintiff's explanations of his limitations, the surveillance verifies that he does not leave his home until at least 10:00 a.m. (consistent with his complaints of morning stiffness), and at times, walks with a limp.  One two dates, he did not leave his home at all (consistent with his complaints of waxing and waning pain)

(H910, H932).

Additionally, although Hartford cites to Plaintiff's ability to drive from Largo, Florida to Tampa, Florida and his attendance at a concert as proof that he is not disabled, Plaintiff's appeal letter explains that "the three plus hour concert that I attended was the graduation of the students that I had spent the year teaching.  I took extra pain medication prior to the graduation and was unable to pose for requested pictures or enjoy the after graduation social.  I left immediately after the graduation, went home took a sleeping pill and pain pill and went to bed" (H191).  The surveillance shows that the next day Plaintiff did not leave his home until approximately 11:00 a.m.  *See Cross v. Metropolitan Life Insurance Co.*, 2008 WL 4216555 (11th Cir. Sept. 16, 2008) (finding that insurance company mischaracterized surveillance footage that spanned five days but only resulted in two hours of video and did nothing to disprove Plaintiff's reports of pain); *Byrom v. Delta Family Care- Disability and Survivorship Plan*, 343 F.Supp. 2d 1163, 1184 (N.D.Ga. 2004) (finding insurance company's reliance on three- minute tractor ride one day out of five days of surveillance did not support conclusion plaintiff could engage in occupation).

Hartford's finding that Plaintiff does not suffer from a cognitive deficit is also belied by the administrative record.  Plaintiff and his treating doctors assert that his pain medications cause cognitive deficits, interfering with his ability to practice medicine competently.  Dr. DiGiovanni's correspondence to Hartford indicates Plaintiff's hydrocodone, an opiod derivative, may affect his cognitive function.  In the letter, Dr. DiGiovanni suggests that it would be unsafe for Plaintiff to practice medicine while taking this medication (H400).  Likewise, Plaintiff's pain management doctor, Dr. Chowdhury, counseled Plaintiff against practicing medicine while on such medications.  "At this point, Dr. Franklin's best treatment for the multiple joint pain would be narcotics, however, if he takes narcotics Dr. Franklin would be recommended not to work. (H694).

21

I also find that Hartford inappropriately disregarded Dr. DiGiovanni's opinion that Plaintiff risks infection by working as a physician while on immunosuppressive medications. Hartford's consulting doctor "investigated this issue" and found no evidence to support Dr. DiGiovanni's opinions. Finally, although Plaintiff was not awarded Social Security benefits until after Hartford terminated his disability benefits, it is nevertheless worth noting that Hartford encouraged Plaintiff to apply for Social Security disability benefits, even hiring a company to represent Plaintiff in applying for and securing SSD benefits (H8-9, H641). *See Glenn,* 128 S.Ct. at 2352 (noting as important the fact that MetLife had encouraged plaintiff to argue to the Social Security administration that she could do no work, received the bulk of the benefits of her success in doing so, and then ignored the agency's finding in concluding that plaintiff could in fact do sedentary work).[10]

Following *Glenn* and *Doyle,* I have considered the administrator's conflict, and conclude, for the reasons set forth above, that Hartford's decision was arbitrary and capricious.

*D. Conclusion*

In sum, I find that Hartford's decision to deny benefits was "wrong" and arbitrary and capricious. Based on the administrative record, and considering the administrator's conflict, I find Hartford's decision unreasonable and recommend the Plaintiff's motion for summary judgment be

---

[10] Hartford rendered its decision to discontinue disability benefits in August 2006, but the Social Security Administration did not award benefits to Plaintiff until July 2007. Hence, the Social Security award was not part of the administrative record, and cannot be considered by this Court. *Richards v. Hartford Life & Acc. Ins. Co.*, 153 Fed. Appx. 694, 697 n.1 (11th Cir. 2005) (finding district court correctly refused to consider plaintiff's award of social security benefits issued ten months after Hartford's final decision because ERISA review is confined to evidence before administrator when claim for benefits is denied). *See also Menard v. Hartford Life & Acc. Ins. Co.,* 2008 WL 506228 (M.D. Fla. Feb. 14, 2008) (upon remand from Eleventh Circuit the district court limited its *de novo* review to administrative record and did not consider Social Security award rendered after disability insurer's final decision).

GRANTED and the Defendant's motion for summary judgment be DENIED.   Accordingly, it is hereby

RECOMMENDED:

1.      Plaintiff's Motion for Summary Judgment (doc. 20) be GRANTED and Defendant's Motion for Summary Judgment (doc. 21) be DENIED.

2.      Defendant's Motion for leave to file reply memorandum of law in support of its motion for summary judgment (doc. 29) be DENIED.

It is so REPORTED at Tampa, Florida on this 20th day of October, 2008.


*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted, or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice.  28 U.S.C. § 636(b)(1)(C); Local Rule 6.02, *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982)(*en banc*).

Copies furnished to:
Hon. Steven D. Merryday
Counsel of Record